UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

DENNY ANN GIAMBRONE,

                          Plaintiff,

v.                                                          **MEMORANDUM & ORDER**
                                                            15-CV-05882 (PKC)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                          Defendant.
-----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

Plaintiff Denny Ann Giambrone ("Plaintiff") brings this action under 42 U.S.C. § 405(g),

seeking judicial review of the Social Security Administration's ("SSA") denial of her claim for

Disability Insurance Benefits ("DIB"). The parties have cross-moved for judgment on the

pleadings. (Dkts. 15, 17.) Plaintiff seeks reversal of the Commissioner's decision and an

immediate award of benefits, or alternatively, remand for further administrative proceedings. The

Commissioner seeks affirmation of the denial of Plaintiff's claims. For the reasons set forth below,

the Court GRANTS Plaintiff's motion for judgment on the pleadings and DENIES the

Commissioner's motion. The case is remanded for further proceedings consistent with this

opinion.

# BACKGROUND

## I.   PROCEDURAL HISTORY

Plaintiff filed an application for DIB on September 27, 2011, alleging disability beginning January 15, 2010 due to asthma, diabetes, arthritis, gout,[1] generalized anxiety disorder, colitis,[2] diverticulosis,[3] thyroid disease, and hormone problems.  (Tr. 167–69, 202.)[4]  Her last date insured was June 30, 2012.  (Tr. 4.)  On February 01, 2012, the SSA denied Plaintiff's claim.  (Tr. 101.)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on March 26, 2012.  (Tr. 107.)  Plaintiff, represented by counsel, appeared at a hearing before ALJ Miriam L. Shire on April 24, 2013 ("ALJ Hearing").  (Tr. 25–80.)  In a decision dated December 27, 2013, the ALJ denied Plaintiff's claims.  (Tr. 88–96.)  Subsequently, the Appeals Council granted Plaintiff's request for review.  In a decision dated August 18, 2015, the Council reversed the ALJ's finding that Plaintiff was able to perform her past relevant work.  (Tr. 5.)  However, it adopted the ALJ's ultimate conclusion that Plaintiff was not disabled, because it found that Plaintiff was capable of

---

[1] Gout, a complex form of arthritis, is characterized by sudden, severe attacks of pain, redness, and tenderness in joints, often the joint at the base of the big toe.  *See* Mayo Clinic, *Gout*, http://www.mayoclinic.org/diseases-conditions/gout/basics/definition/CON-20019400 (last visited 3/30/17).

[2] Colitis is an inflammation of the inner lining of the colon.  *See* MedicineNet, *Colitis (Types)*, http://www.medicinenet.com/colitis/article.htm (last visited 3/20/17).

[3] "Diverticulosis occurs when small, bulging pouches (diverticula) develop in [the] digestive tract.  When one or more of these pouches become inflamed or infected, the condition is called diverticulitis."  *See* Mayo Clinic, *Diverticulosis and Diverticulitis*, http://www.mayoclinic.org/diseases-conditions/diverticulitis/multimedia/diverticulosis-and-diverticulitis/img-20006098 (last visited 3/30/17).

[4] "Tr" refers to the Administrative Transcript. (Dkt. 9.)  Page references are to the continuous pagination of the Administrative Transcript supplied by the Commissioner.

performing a number of other jobs that exist in significant numbers in the national economy. (Tr. 5.) Plaintiff timely filed this action on October 13, 2015. (Dkt. 1.)

## II. ADMINISTRATIVE RECORD

### A. Medical Evidence

#### 1. Treating Physicians

##### a. Dr. Martha Anthony

From December 2007 through March 2013, Drs. Martha Anthony and Joseph Vento treated Plaintiff for a variety of conditions at Millennium Medical Services, P.C., including generalized anxiety disorder, hyperthyroidism,[5] diabetes, hematuria,[6] asthma, ulcerative colitis, amenorrhea,[7] and gout. (Tr. 424–529.)

Plaintiff's primary treating physician, Dr. Anthony, began treating Plaintiff on September 26, 2011. (Tr. 523, 535.) Dr. Anthony completed a walking questionnaire regarding Plaintiff's condition on April 16, 2013, the conclusions of which were effective as of September 26, 2011. (Tr. 532.) The report stated that Plaintiff was unable to use public transportation, and was unable

---

[5] Hyperthyroidism (overactive thyroid) is a condition in which the thyroid gland produces too much of the hormone thyroxine. Hyperthyroidism can accelerate the body's metabolism significantly, causing sudden weight loss, a rapid or irregular heartbeat, sweating, and nervousness or irritability. *See* Mayo Clinic, *Hyperthyroidism (overactive thyroid)*, http://www.mayoclinic.org/diseases-conditions/hyperthyroidism/basics/definition/con-20020986 (last visited 3/20/17).

[6] Hematuria is blood in the urine. *See* Mayo Clinic, *Blood in Urine (Hematuria)*, http://www.mayoclinic.org/diseases-conditions/blood-in-urine/basics/definition/con-20032338 (last visited 3/20/17).

[7] Amenorrhea is the absence of menstruation. *See* Mayo Clinic, *Amenorrhea*, http://www.mayoclinic.org/diseases-conditions/amenorrhea/basics/definition/con-20031561 (last visited 3/21/17).

to walk for one block at a reasonable pace on rough or uneven surfaces. (*Id.*) The report also stated that Plaintiff was able to carry out routine ambulatory activities and climb a few steps at a reasonable pace with the use of a handrail, and did not require an assistive device to walk. (*Id.*) Dr. Anthony also indicated that Plaintiff had severe pain due to a full-thickness chondral injury to her knee.[8] A separate questionnaire indicated that Plaintiff had joint pain, swelling and tenderness in her knee and lumbar spine, which was expected to last for at least 12 months. (Tr. 533.)

Dr. Anthony completed a residual function capacity form dated April 16, 2013, the conclusions of which were applicable as of September 26, 2011. (Tr. 535.) Dr. Anthony wrote that Plaintiff was not able to use standard public transportation or carry out routine ambulatory activities such as shopping or banking. (Tr. 531.) She reported that Plaintiff did not require assistive devices to walk. (Tr. 531.) Dr. Anthony opined that Plaintiff was able to sit for two hours over an eight-hour workday, but was not able to stand or walk for any period of time over an eight-hour workday. (Tr. 534.) The form also noted that Plaintiff was unable to bend, squat, crawl, climb, or lift or carry over ten pounds. (Tr. 535.) It stated that Plaintiff had moderate persistent asthma and that she could not be exposed to extreme temperature, humidity, or strong odors. (Tr. 535.)

---

[8] "A chondral knee injury is the result of articular cartilage damage within the knee." Damage to the full thickness of the articular cartilage is damage "all the way to the bone." *See* The Steadman Clinic, *Articular Cartilage Damage*, http://drmillett.com/chondral-knee-injuries-articular-cartilage-damage/ (last visited March 19, 2017).

Dr. Anthony wrote that Plaintiff had severe pain, and that medical signs or laboratory findings, *i.e.*, an MRI, showed the existence of a medically determinable impairment—full-thickness chondral knee injury—that could reasonably be expected to produce the pain.  (Tr. 531.)[9]

### b. Lutheran Medical Center

From November 21 to November 23, 2011, Plaintiff was treated for pneumonia at Lutheran Medical Center.  (Tr. 273–323.)  While there, she complained about left groin pain, dysuria,[10] abdominal pain, and shortness of breath.  (Tr. 273–79.)  She reported a past medical history of asthma, gout, colitis, hyperlipidemia,[11] diverticulosis, diabetes, and hypothyroidism. (Tr. 273.)  She was discharged against medical advice because of family reasons.  (Tr. 273–78.)

On March 25, 2012, Plaintiff received treatment at the Lutheran Medical Center emergency room, where she was diagnosed with a calcaneal spur.[12]  (Tr. 399–400.)

---

[9] An undated and unsigned evaluation from Vento Medical Center, which indicated that Plaintiff had last been examined on November 4, 2011, noted that Plaintiff had been undergoing treatment 1–2 times a month for abdominal pain, hematuria, and diabetes.  (Tr. 324.)  The evaluation also noted that Plaintiff was independent with respect to activities of daily living, such as grooming, shopping, cooking, and taking public transportation.  (Tr. 332.)  It stated that Plaintiff experienced no limitations on her ability to lift and carry, walk, sit, and stand.  (Tr. 333.)  With regard to the Plaintiff's mental state, the evaluator opined that Plaintiff had no limitation on understanding, concentration, and social interaction.  (Tr. 334.)  In the evaluator's opinion, Plaintiff was able to adapt to changes in work and use public transportation.  (Tr. 335.)  It is not clear who filled out this form.

[10] Dysuria is a symptom of pain, discomfort, or burning when urinating.  *See* WebMD, *Dysuria*, http://www.webmd.com/women/dysuria-causes-symptoms (last visited 3/21/17).

[11] Hyperlipidemia is elevated levels of lipids in the blood plasma.  *See* STEDMAN'S MEDICAL DICTIONARY 424210, *Hyperlipidemia*.

[12] A calcaneal spur is a bony spur, or heel spur, that projects from the back or underside of the heel bone (the calcaneus) and that may make walking painful.  *See* MedicineNet, *Calcaneal Spur*, http://www.medicinenet.com/script/main/art.asp?articlekey=7095 (last visited 3/30/17).

On April 13, 2012, she returned the emergency room with bronchitis.  (Tr. 384.)

### c. January 28, 2012 MRI and X-Ray images

Multiple MRI and X-Ray images of Plaintiff's feet and ankles were taken by Doshi diagnostic imaging services in early 2012.  (Tr. 391–96.)  X-Rays of Plaintiff's ankles revealed bilateral posterior and plantar calcaneal spurs; the images also revealed a widening of the lateral ankle mortise,[13] which may suggest lateral ankle ligament disruption.  (Tr. 396.)  X-Ray images of Plaintiff's feet showed calcaneal spurs and bilateral hallux valgus.[14]  (Tr. 395.)  An MRI of the right ankle showed irregularity of the anterior talofibular ligament,[15] which was consistent with a partial tear, mild effusion,[16] and a mild subchondral signal abnormality of the distal fibula[17] and adjacent talus.[18]  (Tr. 391.)  An MRI of the left ankle showed tissue edema, joint effusion, mild subchondral signal abnormality of the distal fibula and adjacent talus, and osteochondritis

---

[13] The mortise joint is the ankle joint.  *See* STEDMAN'S MEDICAL DICTIONARY 406060.

[14] A hallux valgus is commonly called a bunion.  *See* American Orthopaedic Foot and Ankle Society, *Hallux Valgus*, http://www.aofas.org/PRC/conditions/Pages/Conditions/Hallux-Valgus.aspx (last visited 3/20/17).

[15] The anterior talofibular ligament is a ligament in the ankle.  *See* HealthLine, *Anterior Talofibular Ligament*, http://www.healthline.com/human-body-maps/anterior-talofibular-ligament (last visited 3/30/17).

[16] Joint effusion is a term for swollen joints.  *See* WebMD, *Joint Effusion*, http://www.webmd.com/arthritis/swollen-joints-joint-effusion (last visited 3/21/17).

[17] The fibula is the calf bone.  *See* STEDMAN'S MEDICAL DICTIONARY 111940.  The distal fibula is the lower part of the bone.  *See* Fairview, *Ankle Fracture, Distal Fibula*, http://www.fairview.org/healthlibrary/Article/116733EN (last visited 3/30/17).

[18] The talus bone is the ankle bone.  STEDMAN'S MEDICAL DICTIONARY 111810.

dissecans of the lateral talar dome.[19]  (Tr. 393.)  An MRI of the right foot showed mild soft tissue edema and mild subchondral signal abnormality of the tarsal bones, which may suggest arthritic changes.  (Tr. 294.)  MRI of the left foot showed the same issues.

d. March 2, 2013 MRI Images

In March 2013, MRI images of Plaintiff's spine and knees were taken, along with x-rays of Plaintiff's right knee.  (Tr. 412–19.)  The MRI of Plaintiff's spine revealed mild facet arthropathy[20] in the lower lumbar spine with mild disc bulges.  (Tr. 413.)  X-Rays of the right knee showed early osteoarthritis in the medial and patellofemoral compartments.  (Tr. 415.)  MRI of the left knee showed a full-thickness chondral injury along the lateral facet of the patella[21] with subchondral cyst formation and malformation, along with a bony infarct[22] in the medial femoral

---

[19] Osteochondritis dissecans is the complete or incomplete separation of a portion of joint cartilage and underlying bone, usually involving the knee.  *See* STEDMAN'S MEDICAL DICTIONARY 637440.

[20] Facet joint arthropathy refers to a degenerative disease that affects the joints of the spine and the disintegration of cartilage on those joints.  *See* Laser Spine Institute, *Facet Joint Arthropathy*, https://www.laserspineinstitute.com/back_problems/facet_disease/articles/facet_joint_arthropathy/ (last visited 3/29/17).

[21] The patella is the kneecap.  *See* MedicineNet, *Medical Definition of Patella*, http://www.medicinenet.com/script/main/art.asp?articlekey=4795 (last visited 3/30/17).  The Patellofemoral compartment is the third compartment of the knee formed by the kneecap and the front part of the femur.  HSS, *Patellofemoral Arthritis in the Knee: An Overview*, https://www.hss.edu/conditions_patellofemoral-arthritis-in-the-knee-overview.asp (last visited 3/30/17).

[22] An infarct is "an area of necrosis resulting from a sudden insufficiency of arterial or venous blood supply.  *See* STEDMAN'S MEDICAL DICTIONARY 443430.

condyle[23] and discoid lateral meniscus.[24]  (Tr. 416.)  The image also showed a Baker's cyst.[25] (*Id.*)

### e.  Dr. Henry Tischler

On Dr. Anthony's referral, Plaintiff was examined by Dr. Henry Tischler on March 11, 2013.  (Tr. 538.)  Dr. Tischler noted that Plaintiff had a history of bilateral knee pain, primarily in the left knee, which radiated down her leg.  (*Id.*) Dr. Tischler's report also indicated that Plaintiff was using a cane, and had "significant" difficulty negotiating stairs, with episodes of giving way. (*Id.*)  Dr. Tischler noted that Plaintiff could ambulate "approximately half a block and back," and could ambulate two blocks with the assistance of a cane.  (*Id.*)  He noted crepitation[26] with range of motion in both knees.  (Tr. 540.)  Plaintiff reported having difficulty with work and household activities, and experiencing "continuous, excruciating, pulsating, throbbing" pain in her knee. Plaintiff described the pain as an eight on a scale from one to ten when at rest or ambulating straight, and a ten out of ten when using stairs, changing positions, or engaging in other activity.

---

[23] The medial condyle of the femur is one of the two large, rounded articular masses of the distal end of the femur.  *See* STEDMAN'S MEDICAL DICTIONARY 197210.

[24] The meniscus is a "wedge-shaped piece of cartilage that sits in between the bones of the knee and acts as a cushion to protect the bones during movement."  A discoid meniscus is thicker than a normal meniscus, and is "more prone to injury than a normally shaped meniscus."  *See* OrthoInfo, *Discoid Meniscus*, http://orthoinfo.aaos.org/topic.cfm?topic=A00570 (last visited 3/30/17).

[25] A Baker's cyst is a fluid-filled cyst that causes a bulge and a feeling of tightness behind your knee. *See* Mayo Clinic, *Baker's Cyst*, http://www.mayoclinic.org/diseases-conditions/bakers-cyst/basics/definition/con-20023332 (last visited 3/20/17).

[26] Crepitus is a crackling, grating, or popping sensation when bending the knee.  Arthritis Health, *Crepitus in the Knee*, http://www.arthritis-health.com/types/general/crepitus-knee (last visited 3/21/17).

(Tr. 539.)  Dr. Tischler's exam further indicated that Plaintiff suffered from depression, anxiety, difficulty sleeping, dizziness, abdominal cramping, and difficulty breathing.  (Tr. 539.)  Plaintiff reported to Dr. Tischler that she smoked.  (Tr. 539.)

Dr. Tischler reviewed the March 2, 2013 MRI images of Plaintiff's knees and lumbar spine. This analysis revealed a full-thickness chondral injury in the left knee, along with subchondral cyst formation and malformation, along with a bony infarct in the medial femoral condyle and a discoid lateral meniscus.  (Tr. 542.)  Dr. Tischler diagnosed patellofemoral syndrome[27] in both knees, left greater than right.  (*Id.*)  The MRI of Plaintiff's spine revealed mild facet arthropathy in the lower lumbar spine, along with mild disc bulges.  (*Id.*)  Dr. Tischler prescribed physical therapy and strengthening activities for these injuries, including stretching and the use of a stationary bicycle. (Tr. 414.)

### f.  Dr. Soheila Jafari

Between March 11, 2013 and April 8, 2013, Plaintiff saw Dr. Soheila Jafari, a pain medicine specialist, three times for back and knee pain.  (Tr. 251–56.)  Dr. Jafari reported that Plaintiff had an antalgic gait,[28] knee tenderness, reduced range of motion in her right knee, trigger

---

[27] Patellofemoral pain syndrome (PFPS) is pain in the front of the knee, sometimes caused by wearing down, roughening, or softening of the cartilage under the kneecap.  *See* WebMD, *Patellofemoral Pain Syndrome – Topic Overview*, http://www.webmd.com/pain-management/knee-pain/tc/patellofemoral-pain-syndrome-topic-overview (last visited 3/30/17).

[28] An antalgic gait is a characteristic gait resulting from pain on weight-bearing in which the stance phase of gait is shortened on the affected side.  *See* STEDMAN'S MEDICAL DICTIONARY 359070.

points in the lumbar paraspinal muscle, and claudication.[29]  (Tr. 252, 254, 256.)  She noted that an MRI of Plaintiff's left knee showed full-thickness chondral injury along the lateral facet of the patella with subchondral cyst formation, bony infarct within the medical femoral condyle, discoid lateral meniscus without evidence of a tear, and a Baker's cyst.  (Tr. 252.)  Dr. Jafari diagnosed Plaintiff with PMHx DM, asthma, obesity, hypothyroidism, UC and CLBP[30] and back pain, and stated that Plaintiff "presents with multiple pain problems including axial back pain" and bilateral knee pain, with the left greater than the right.[31]  (Tr. 256.)

### 2. Consultative Physicians

#### a. Dr. Benjamin Kropsky

On December 29, 2011, Dr. Benjamin Kropsky, an internist, performed a consultative medical examination of Plaintiff.  (Tr. 345–54.)  He reported that Plaintiff had a history of gout that mainly affected her toes, ankles, and knees, with pain that could reach a nine out of ten.  (Tr. 345.)  He reported that her gout prohibited her from prolonged walking and climbing stairs.  (*Id.*) He also diagnosed her with irritable bowel syndrome, diverticulosis, diabetes, and low thyroid levels, and reported that Plaintiff stated that she often had diarrhea and abdominal cramping.  (*Id.*)

---

[29] Claudication is pain caused by too little blood flow.  *See* Mayo Clinic, *Claudication*, http://www.mayoclinic.org/diseases-conditions/claudication/basics/definition/con-20033581 (last visited 3/21/17).

[30] The Court assumes that "CLBP" refers to "chronic low back pain."  *See* Acronym Finder, http://www.acronymfinder.com/Science-and-Medicine/CLBP.html (last visited 3/20/17).

[31] Neither party explains, nor can the Court determine, what Dr. Jafari's references to "PMHx DM" and "UC" mean.

Dr. Kropsky noted that Plaintiff, who had asthma, had been smoking two packs a day since the age of 16, but was only smoking half a pack per day at the time of her examination, and was attempting to quit. (Tr. 346.)

Regarding daily activities, Dr. Kropsky reported that Plaintiff was able to cook daily with some help and do light cleaning, although she could not tolerate dust or fumes. (Tr. 346.) She was also able to bathe and dress herself daily, but needed help when the gout was severe. (*Id.*) She would not shower unless someone was home because she was afraid she might fall. (*Id.*) Plaintiff did not do laundry or shopping, and enjoyed watching TV, listening to the radio, reading, and going on family holidays. (*Id.*)

In his report, Dr. Kropsky stated that Plaintiff had a normal gait and was in no "acute distress." (Tr. 347.) While she had "great" difficulty walking on her toes, Plaintiff could walk on her heels without difficulty. (*Id.*) She could squat halfway down with some pain in her right ankle. (*Id.*) Plaintiff did not use an assistive device, and she did not require help changing for the exam or getting on and off the examination table. (*Id.*) Plaintiff experienced mild difficulty rising from a chair. (*Id.*)

Dr. Kropsky found that Plaintiff had full range of motion in her cervical spine, lumbar spine, shoulders, elbows, forearms, and wrists. (Tr. 347–48.) He found no abnormality in Plaintiff's spine, and stated that she had full range of motion in both knees. (Tr. 347.) Plaintiff had mild swelling and moderate tenderness in her right ankle. (*Id.*) A pulmonary examination showed that Plaintiff did not have significant lung function abnormality, although her lung function was not fully normal. (Tr. 353.) The x-rays of Plaintiff's knees that Dr. Kropsky examined were both negative. (Tr. 348, 350–51.)

Dr. Kropsky reported light wheezing but normal diaphragmatic motion. (Tr. 347.) Plaintiff's cervical spine and lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally, and she did not have scoliosis. (Tr. 348–49.) Dr. Kropsky found that Plaintiff had full range of motion of her knees bilaterally, that her ankles lacked some flexion, and were mildly swollen and mildly to moderately tender. (Tr. 348.)

In sum, Dr. Kropsky diagnosed Plaintiff with asthma, gout, irritable bowel syndrome, hypothyroidism, and diabetes. (Tr. 348–49.) Dr. Kropsky opined that Plaintiff had "moderate" limitations on climbing stairs, squatting, and kneeling, and "mild to moderate" limitation for prolonged walking. (Tr. 349.) Dr. Kropsky also opined that Plaintiff should avoid smoke, dust, and other respiratory irritants because of her asthma. (*Id.*)

### b. Dr. Alan Dubro

On December 29, 2011, Plaintiff underwent a consultative psychiatric evaluation performed by Dr. Alan Dubro, Ph.D. (Tr. 339–43.) At this consultation, Plaintiff reported that she had a history of anxiety spanning many years, which was heightened due to medical problems she had experienced over the previous months. (Tr. 340.) She described general difficulty dealing with day-to-day stress and feelings of anxiety in social situations. (*Id.*) She reported that medication was "helpful." (*Id.*) Dr. Dubro also noted that Plaintiff had cut her smoking back to half a pack per day at the time of the examination.

Plaintiff reported that she dressed herself and maintained her hygiene independently, prepared meals for herself and her family on a daily basis, did general cleaning at home several times per week, and did laundry and went food shopping on her own several times per week. (Tr. at 341–42.)

Dr. Dubro noted that Plaintiff's mood was mildly anxious; her attention and concentration were mildly impaired, due to distractibility associated with nervousness. (Tr. 341.) Her recent and remote memory skills were also mildly impaired for the same reason. (*Id.*) Her cognitive functioning was estimated to fall in the low-average range. (*Id.*)

Dr. Dubro diagnosed Plaintiff with generalized anxiety disorder. (Tr. 342.) He opined that Plaintiff's attention span and concentration were mildly impaired and that she would experience mild difficulty in learning new tasks, interacting with others, regularly attending to a routine, and maintaining a schedule. (*Id.*) However, Dr. Dubro stated that these difficulties did not significantly interfere with Plaintiff's ability to function on a daily basis. (*Id.*)

### c. W. Skranovski

On January 26, 2012, State agency psychiatric consultant W. Skranovski, M.D., reviewed the record and assessed Plaintiff's degree of psychological impairment. (Tr. 355–68.) Dr. Skranovski rated Plaintiff's functioning under paragraph B of listing 12.06, concluding that she had no limitation with regard to the activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace. (Tr. 365.) Further, Dr. Skranovski indicated that Plaintiff had never experienced repeated and extended episodes of deterioration. (*Id.*) While Plaintiff reported that she was unable to travel alone, the consultant concluded that these assertions were not supported by any related pathology, such as agoraphobia, dementia, or other active psychotic symptoms. (Tr. 367.) Dr. Skranovski reported that her statements about poor cognition and social skills were not supported by examination or any objective data. (Tr. 367.) Additionally, Dr. Skranovski concluded that the objective data did not show any functional limitations resulting from Plaintiff's alleged anxiety disorder. (*Id.*)

#### d. Dr. Malcolm Druskin

In a case analysis dated June 12, 2012, state agency medical consultant Malcolm Druskin, M.D., reviewed Plaintiff's claim. Dr. Druskin found that Plaintiff's claim of disability was not credible, and that the record evidence did not support a claim of musculoskeletal limitations. (Tr. 384–85.)

#### e. Expert Medical Testimony: Dr. Gerald Galst

A medical expert, Dr. Gerald Galst, an internist and cardiologist, testified at the ALJ Hearing on April 24, 2013. (Tr. 55–66.)[32] Dr. Galst described Plaintiff, who was 5'4" tall and 275 pounds at the time of the hearing, as morbidly obese. (Tr. 56.) He testified that Plaintiff's thyroid and lung function were normal, and that she showed minimal elevation of blood sugar levels. (Tr. 57.) Reviewing the X-rays and MRI images of Plaintiff's spine, feet, ankles, and knees, Dr. Galst opined that these studies did not reveal any conditions that would be severe enough to meet a 104 Listing, and that he did not believe they met a 102 listing, either. (Tr. 58.) While Plaintiff did suffer from asthma, pulmonary testing showed that her lung function was normal. (Tr. 59.) He also testified that the diagnosis of Plaintiff's treating physician, Dr. Anthony—*i.e.*, that Plaintiff was unable to stand or walk for any length of time—was not consistent with the medical records or the X-ray findings in the record. (*Id.*) In response to questioning by Plaintiff's attorney, Dr. Galst testified that the bony infarct in the medial femoral condyle shown in the MRI of Plaintiff's left knee was a nonspecific finding, which showed that there may have been some vascular injury to the bone at some point in time. (Tr. 62.) The full-thickness chondral injury to the same knee, Dr. Galst testified, could cause knee pain and limit Plaintiff's ability to

---

[32] It appears that Dr. Galst did not conduct a medical examination of Plaintiff, but testified solely based on a review of Plaintiff's medical records.

14

walk, although it would not usually limit the range of motion in the knee. (Tr. 63.) He also stated that the bulging disk in Plaintiff's back shown by the MRI was a nonspecific finding, which was common in most older individuals. (*Id.*) He found that the bunions and calcaneal spurs in Plaintiff's feet and ankles could limit Plaintiff's ability to walk "somewhat." (Tr. 64.) Dr. Galst also stated that the signal abnormality of the tarsal bones in Plaintiff's ankles suggested arthritis, but doubted that this condition would be disabling. (Tr. 65.) When asked whether Plaintiff would have difficulty walking for a block on an uneven surface in light of her conditions, Dr. Galst testified that Plaintiff should be able to walk "more than a block." (*Id.*)

**B. Non-Medical Evidence**

1. Questionnaires

In a November 1, 2011 Disability Report, Plaintiff reported that her last employment was in September 2011, where she worked for four hours per day, five days per week, as a telemarketer for Neighborhood Outreach. (Tr. 186, 202–03.)

She reported that she could no longer work due to constant diarrhea and stomach pain, rectal bleeding due to colitis and medications, and diabetes. (Tr. 208.) She also reported that she could not walk up or down stairs without help because of constant pain in her knees, ankles, and wrists and trouble breathing, that she could not walk with a cane because of pain in her wrists, and that she was allergic to all NSAIDs[33] and could not take them because of drug interactions. (Tr. 208.) She wrote that she could only stand for ten to fifteen minutes at a time before having to sit, due to gout pain, and that she sat for three to five hours each day. (Tr. 214–15.) Plaintiff stated

---

[33] Nonsteroidal Antiinflammatory Drugs (NSAIDs) are drugs exerting antiinflamatory actions, and include aspirin, acetaminophen, diclofenac, indomethacin, ketorolac, ibuprofen, and naproxen. STEDMAN'S MEDICAL DICTIONARY 267230.

that pain in her ankles, big toes, knees, and wrists was "stabbing, throbbing, shooting up and down from [her] toes to [her] knees," and that it also spread to her hip and pelvic area, as well as to her elbows. (Tr. 218.) The pain was there "all the time," and to manage the pain, she took Tramadol, Acetaminophen, Allopurinol, Pantoprazanole, Albuterol, Dicyclomine, Levothyroxine, and Aprazolam. (Tr. 218.)

She further reported that she got diarrhea at least 15 times per day, and that diabetes caused her to urinate in her pants frequently. (Tr. 208, 217.) Coughing and breathing difficulties from asthma made it difficult to talk on the phone, and she used a nebulizer and a daily fast-acting asthma pump. (Tr. 208, 220.) When those did not work she would go to the emergency room or to her doctor for steroid injections. (Tr. 220.) Plaintiff also wrote that she was in so much pain that she could not complete tasks at work or travel to work without pain or dizziness and fear of fainting or a diabetic coma. (Tr. 208.)

Plaintiff reported that in the mornings, after making her son breakfast and sending him to school, she would take medicine and fall asleep. (Tr. 210.) She wrote that her husband and son helped take care of her. (*Id.*) Plaintiff wrote that it was hard to cook, stand too long, or walk up stairs, and that she could feed herself but, most of the time, needed help getting up off the toilet. (Tr. 210–11.) She needed help with cleaning, because dusting would bring on asthma, and lifting a laundry bag. She could use her hands all the time, except for opening jars and lids, although after using her hands for a long period of time, her wrist and fingers would hurt and she would need to take a break. (Tr. 215.)

On the form, Plaintiff stated that she went outside once or twice a week, but that when she walked, her gout hurt and her body would produce uric acid, and her ankles and knees would be swollen and in pain. (Tr. 212.) She stated that she never went out alone because of fear that she

would faint, having fainted in the street in the past, and because being alone made her anxious. (*Id.*) She wrote that she used her cane all the time, but sometimes could not use it because of gout in her wrist. (Tr. 216.)

Regarding social activities, Plaintiff reported that about twice a month she would invite friends to watch movies at her house, but that she did not go out. (Tr. 214.) She wrote that her heart would race when she met new people, and when she went to the doctor. (Tr. 221.) Socializing had become a task because it was hard to get dressed and her feet would swell, such that her shoes did not fit. (Tr. 219.) As a result, she would stay home and elevate her legs. (Tr. 219.) She reported that she was "always crying" because she was depressed about not having a normal life or job. (Tr. 219.)

### 2. ALJ Hearing

#### a. Plaintiff's Testimony

Plaintiff was thirty-six years old at the time of hearing. She testified that she had finished high school and two years of college. (Tr. 29–30.) Plaintiff had worked steadily up until 2006 as a sales manager at a telemarketing firm; her responsibilities included monitoring 30 employees as they did their jobs, hiring and firing, and ordering materials for the office. (Tr. 30–31.) Prior and subsequent to this position, she had worked as a telemarketer, which involved sitting at a computer and talking to prospective customers over a headset.

Plaintiff testified that she stopped working because she had severe asthma, and she needed to avoid the dust and cleaning agents in the office. (Tr. 34.) At the time of the hearing, Plaintiff treated her asthma with daily medication and the occasional use of a nebulizer. (Tr. 35.) She had been hospitalized several times due to asthma, and had also been hospitalized with pneumonia. (*Id.*) Although Plaintiff had been a heavy smoker, she testified that she had cut back her smoking

habit from two packs a day to half a pack by the time she met with a SSA doctor in December of 2011. (Tr. 36.) Subsequently, Plaintiff quit smoking entirely, although she was unable to recall the approximate date when she fully quit. (*Id.*)

Plaintiff also testified that she suffered from osteoarthritis, a condition that had initially been misdiagnosed as gout. (Tr. 37.) Plaintiff took pain medication to manage the pain in both her knees. (Tr. 38.) She had originally been prescribed Percocet, but had switched to Vicodin because the Percocet caused her to become nauseous and dizzy. (*Id.*) Although the Vicodin did not cause the same degree of nausea and dizziness and was "a little better," Plaintiff stated that she still experienced side effects from the Vicodin when taken in conjunction with her other medications. (Tr. 38, 49.) The side effects of her medications included fatigue, dizziness, tiredness, nausea, and vomiting. (Tr. 48.)

Plaintiff testified that she was 5'5 and weighed 275 pounds. (Tr. 39.) She described the pain in both her knees as a "ten" on a scale from one to ten when she was not on medication; when she was on the medication, this pain was an eight or nine. (Tr. 38.) In addition to her knee pain, Plaintiff testified that she experienced pain in her ankles and feet, caused by neuroma,[34] heel spurs, and plantars, which was a "ten" out of ten. (Tr. 43, 50.) She also testified to pain in her lower back, which was caused by a bulging disc in her lumbar spine; this pain was a seven out of ten. (Tr. 50–51.) Plaintiff testified that she needed to have knee replacement surgery to treat her knee pain, but could not undergo the surgery until she lost weight. (Tr. 39.) She testified that she had

---

[34] A neuroma is a general term for any neoplasm (an abnormal tissue that grows by cellular proliferation more rapidly than normal, usually forming a distinct mass of tissue) derived from cells of the nervous system. *See* STEDMAN'S MEDICAL DICTIONARY 601130, 591170.

made an appointment to have lap band surgery—because she needed to reduce her weight from 275 to 180 pounds before undergoing knee replacement—but did not follow through on this appointment because she was afraid.  (Tr. 40.)

Plaintiff also testified that she had been using a cane steadily since she was hospitalized for gout, although she did not use a cane on the day she went to see the SSA doctor in late 2011.  (Tr. 41.)  Plaintiff testified that she found the cane helpful when climbing up and down stairs without a banister.  (Tr. 43.)  However, she testified that she did not use the cane on the day of the hearing, even though she had to climb an unspecified number of stairs in the building to reach the office where the hearing was held.  (*Id.*)

Plaintiff testified that she suffered from Type II Diabetes, which she was trying to manage by changing her diet.  (Tr. 55.)  On occasion, Plaintiff stated that she had gotten dizzy and blacked out in her home due to low blood sugar; she was testing her blood sugar several times a day in order to manage her blood sugar levels.  (*Id.*)

Plaintiff testified that she was able to cook, do dishes, and fold laundry in her house.  (Tr. 44.)  She stated that "sometimes," but not always, she would walk to the grocery store—a distance of two blocks—in order to shop for food with the assistance of her tenant.  (*Id.*)  She also testified that she was able to bathe and dress herself, although she was reluctant to shower when nobody else was home, because she had previously fallen in the bathtub.  (Tr. 45.)  Plaintiff testified that she did not take public transportation at the time of the hearing, although she had taken public transportation when she went to visit a SSA psychiatrist in late 2011.  (Tr. 54.)  She explained that in general, she did not leave home very often, only departing to see doctors or to see family members on holidays.  (Tr. 53.)  She stated that it hurt to pick up a gallon of milk because of arthritis in her wrists.  (Tr. 44–45.)

Plaintiff further stated that she could sit comfortably for roughly twenty or thirty minutes before she had to stand up and walk around. (*Id*.) She also testified that she was unable to walk for more than half a block before experiencing pain in her knees and back; after half a block or one block, the pain began to kick in. (Tr. 46.) Plaintiff testified that she would spend about a quarter of the day sitting with her feet up because it kept the pain away, and about a quarter of the day lying down. (Tr. 51–52.)

Plaintiff testified that she had been experiencing anxiety and had previously suffered from panic attacks. (Tr. 47.) Plaintiff began taking anxiety medication when she was 15 years old after experiencing a post-traumatic stress disorder related to the death of her mother, father and brother. (Tr. 48.)

### b. Plaintiff's Husband's Testimony

Plaintiff's husband, Christopher Garafola, also testified. (Tr. 77.) He stated that around January 2010, Plaintiff's condition progressively got worse, and she started having pain in her legs, joints, and extremities. (Tr. 77–78.) Garafola testified that he could tell from her face that her pain had progressed from a bearable to an unbearable type of pain. (Tr. 78.) Plaintiff's ability to stand, walk, and sit had progressively deteriorated, and she spent most of the time with her feet up because of pain in her ankles and knees. (Tr. 79.) Garafola specified that she spent about half to three-quarters of her day lying down. (Tr. 79.) He testified that she was depressed because her body was hurting and she wanted to be able to do more, and that her activities around the house had become progressively more limited. (Tr. 78–79.) Garafola testified that doing ordinary housework like sweeping or putting away laundry would cause Plaintiff to sweat profusely and turn pale because her blood sugar would drop. (Tr. 81.) She experienced shortness of breath all of the time. (Tr. 81.)

As previously discussed, the ALJ also heard the expert medical testimony of Dr. Galst. *See supra* at 14–15.

Melinda Fass Karlin, a certified rehabilitation counselor and disability management specialist, testified as a Vocational Expert (VE) at the ALJ Hearing. (Tr. 66–77.) The ALJ asked the VE to assume a hypothetical individual, with Plaintiff's background and age, who was unable to balance, use stairs, be exposed to fumes and dust, squat, or engage in prolonged walking. (Tr. 66.) Karlin responded that such an individual would be able to perform her past relevant work as a telephone solicitor, and that she could fulfill the role of sales manager the way that that position is generally performed, but not the way Plaintiff had performed it. (Tr. 67.) Her answer was the same if the hypothetical person used a cane. (Tr. 67.) The ALJ then asked the VE which relevant work the same individual could perform if he or she could only occasionally have social contact. (Tr. 68.) The VE testified that such an individual would be able to work as an addresser, bench hand, or surveillance system monitor. (Tr. 68–69.) The ALJ then proposed a third hypothetical, asking whether any of the work would be possible with a sit/stand option every half hour; the VE responded that working as a sales manager as Plaintiff had previously worked would not be possible, but the other jobs mentioned could be performed with a sit/stand option. (Tr. 69.)

## DISCUSSION

## I. STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act (the "Act") may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such

further time as the Commissioner of Social Security may allow." 42 U.S.C. §§ 405(g), 1383(c)(3). In reviewing a final decision of the Commissioner, the Court's duty is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal citation omitted). However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Under any circumstances, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

## II. ELIGIBILITY STANDARD FOR SOCIAL SECURITY DISABILITY BENEFITS

In order to be found eligible for DIB benefits, claimants must be disabled as defined by the Act. Claimants are disabled under the meaning of the Act when they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant must prove that the impairment is "of such severity that [the claimant] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other substantial gainful work which

exists in the national economy." 42 U.S.C. § 423(d)(2)(A). However, the ALJ has an affirmative obligation to develop the administrative record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009). This means that the ALJ must seek additional evidence or clarification when the claimant's medical reports contain conflicts or ambiguities, if the reports do not contain all necessary information, or if the reports lack medically acceptable clinic and laboratory diagnostic techniques. *Demera v. Astrue*, 12-CV-432, 2013 WL 391006, at *3 (E.D.N.Y. Jan. 24, 2013); *Mantovani v. Astrue*, 09-CV-3957, 2011 WL 1304148, at *3 (E.D.N.Y. March 31, 2011).

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant bears the burden of proof in the first four steps in the inquiry; the Commissioner bears the burden in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. If the claimant is not engaged in "substantial gainful activity," the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is determined to be severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled within the meaning of the Act. However, if the impairment is severe, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings"). 20 CFR § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

If the ALJ determines at step three that the claimant has one of the listed impairments, then the ALJ will find that the claimant is disabled under the Act. On the other hand, if the claimant does not have a listed impairment, the ALJ must determine the claimant's "residual functional

capacity" ("RFC") before continuing with steps four and five. The claimant's RFC is an assessment which considers the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in the work setting." 20 C.F.R. § 404.1545(a)(1). The ALJ will then use the RFC determination in step four to determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer is yes, the claimant is not disabled. Otherwise the ALJ will proceed to step five where the Commissioner then must determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the answer is yes, the claimant is not disabled. However, if not, the claimant is disabled and is entitled to benefits. *Id.*

## III. SSA DECISIONS

### A. The ALJ's Decision

On December 27, 2013, the ALJ issued a decision denying Plaintiff's Claims. (Tr. 88–96.) At the first step, the ALJ concluded that Plaintiff did not engage in substantial gainful activity from the period between the alleged onset date of January 15, 2010 through her last-insured date of December 31, 2011. (Tr. 90.)[35]

At step two, the ALJ found that Plaintiff had three severe impairments: asthma, anxiety disorder, and bilateral knee pain. (*Id.*) She found that Plaintiff's diabetes, misdiagnosed as gout,[36] and IBS were non-severe because the record did not reflect significant treatment notes of those

_____

[35] As noted below, *infra* at 29, the Appeals Council later determined that Plaintiff's last-insured date was June 30, 2012. (Tr. 4.) Plaintiff does not challenge this determination.

[36] Plaintiff, however, testified at the ALJ Hearing that it was her osteoarthritis that was misdiagnosed as gout. (Tr. 36–37.)

impairments and there was "no evidence of any functional limitation resulting from [those] condition[s]." (Tr. 90.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 CFR Pt. 404, Subpt. P, App. 1. (*Id.*) Specifically, the ALJ found that the record did not document required symptoms to meet the requirements of Section 1.02 of the Listings, governing injury to a weight-bearing joint. (Tr. 91.) The ALJ did not explain why she reached this conclusion.

The ALJ stated that although obesity was not a listed impairment, she had considered it in her evaluation. (Tr. 91.) She found that Plaintiff's "activities of daily living and general functioning and inconsistent testimony [did] not fully support the claimant's level of complaints." (*Id.*). With regard to the Plaintiff's mental impairments, the ALJ found that they did not meet the criteria of listing 12.06. (*Id.*) The ALJ also found that Plaintiff had mild restriction on activities of daily living, because the evidence showed that Plaintiff was for the most part "able to engage in activities of daily living in an appropriate and effective manner, on an independent and sustained basis." (*Id.*) She noted that Plaintiff was able to clean, shower, bathe and dress herself, and cook, wash dishes, and shop for groceries with some assistance. (*Id.*) The ALJ found that in social functioning, Plaintiff had moderate difficulties, but that the evidence showed that for the most part Plaintiff was capable of interacting independently, appropriately, effectively, and on a sustained basis with other people. (*Id.*)

Regarding concentration, persistence, and pace, the ALJ found that Plaintiff had mild difficulties, noting that the evidence, including Plaintiff's own testimony, showed that Plaintiff was for the most part "able to sustain focus, attention and concentration sufficiently long enough to permit the timely and appropriate completion of tasks commonly found in work settings." (*Id.*)

Finally, she noted that Plaintiff had experienced no episodes of decompensation of extended duration. (*Id.*) Because these impairments did not cause at least two "marked" limitations in the categories of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the ALJ found that the "paragraph B" criteria of 12.06 were not met. (*Id.*) She further found that the evidence failed to establish the presence of "paragraph C" criteria. (Tr. 92.)

The ALJ next concluded that Plaintiff had the RFC for sedentary work, except that she needed a sit/stand option every half hour, had to avoid dust, fumes and animals, and was unable to climb stairs, balance or squat; further, Plaintiff was only able to interact with the public occasionally. (Tr. 92.) The ALJ noted that Plaintiff used a cane in her right hand when she did walk. (*Id.*)

In making this determination, the ALJ followed the RFC two-step process. (*Id.*) The ALJ determined that although Plaintiff's medically determinable impairments could reasonably be expected to cause pain, Plaintiff's reports concerning the intensity, persistence, and functionally limiting effects of this pain were not entirely credible. (Tr. 94.) She noted that although Plaintiff was diagnosed with anxiety, she did not see a psychiatrist, but only saw her primary care physician who prescribed her Xanax. (*Id.*) She noted that the consultative examiner, presumably Dr. Dubro, rated Plaintiff's psychological symptoms as mild, except for social interactions, which he ranked moderately impaired. (*Id.*) The ALJ found that Plaintiff's testimony and actions contradicted her claims that she experienced significant anxiety or that her medicine did not help a great deal. (Tr. 92–93.)

As evidence of this contradiction, the ALJ noted that Plaintiff was able to go to the store with a non-family member who lived with Plaintiff, that Plaintiff "ha[d] traveled" on public transportation, that she had a cleaner who came to the house, and that she went to friends' houses for holiday parties. (*Id.*) The ALJ also noted that although Plaintiff described avoiding the subways because the crowds made her anxious, the record showed that Plaintiff had taken the subway to her consultative exams. (Tr. 93.) As further evidence undermining Plaintiff's credibility, the ALJ noted that Plaintiff testified at the ALJ Hearing that she quit smoking after being treated for pneumonia on November 21, 2011, but that at the consultative exam on December 29, 2011, she had indicated that she was still smoking half a pack of cigarettes per day, and at the hearing, she could not recall whether she had actually quit smoking. (*Id.*) The ALJ noted that Plaintiff had not appeared with her cane at the hearing, or the consultative examination, and that Dr. Anthony had not mentioned this limitation. (*Id.*) The ALJ also noted that Dr. Tischler found on March 11, 2013 that Plaintiff could ambulate two blocks with a cane. (*Id.*)

The ALJ found that Plaintiff's testimony was "inconsistent" when she initially testified that she had pain, that Percoset made her nauseous and dizzy, and that she had experienced improvement when she switched to Vicodin, but later stated that her medications made her nauseous, dizzy, and tired. (*Id.*) The ALJ also noted that although Plaintiff had received injections from Dr. Jafari, Plaintiff testified that Dr. Jafari misdiagnosed the reasons for her pain and told her that she should not have had injections in the first place. (*Id.*) The ALJ also found it "inexplicabl[e]" that Plaintiff stated that she was unable to carry a gallon of milk due to wrist pain, because the medical evidence contained no mention of any issues dealing with Plaintiff's wrist. (Tr. 93–94.) The ALJ also found such a concept unlikely because Plaintiff testified that she could fold laundry and do some housework. (Tr. 94.) The ALJ did not credit Plaintiff's testimony that

she would lie down for half to three quarters of the day or that she had to sit with her feet up, because the allegations were "not corroborated by imaging which is essentially mild in nature nor any of the medical records from her treating doctors." (*Id.*) The ALJ stated that she did "not doubt" that Plaintiff's weight contributed to her difficulties and that she was in some pain, but noted that imaging showed mostly mild problems. (Tr. 93–94.)

Thus, as noted, the ALJ made a finding that although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible. (Tr. 94.) The ALJ concluded that the laboratory findings—*i.e.*, the X-rays and MRIs taken in January of 2012—only showed mild injuries that were not consistent with debilitating pain. (*Id.*) The ALJ cited Dr. Kropsky's consultative examination to support the conclusion that there were no marked limitations for physical activity. (Tr. 95.) Additionally, the ALJ credited Dr. Dubro's finding that Plaintiff only had moderate restrictions in areas of psychological functioning and gave "some" weight to Dr. W. Skranovski's opinion that Plaintiff had no psychological limitations. (*Id.*) The ALJ stated that "[g]reat weight is accorded to the opinions of Dr. Kropsky and Dr. Dubro as their opinions were based on direct examinations of the claimant and consistent with laboratory and clinical findings." (Tr. 95.)

In contrast, the ALJ accorded "little" weight to the opinion of Dr. Anthony, Plaintiff's treating physician. (Tr. 94.) The ALJ did not engage in any substantive analysis of Dr. Anthony's testimony besides reciting Dr. Anthony's findings and then noting that "[t]he doctor's medical source statement is much more restrictive than what the radiological imaging shows, as well as how the claimant describes her own physical functioning." (Tr. 94.)

At step four, the ALJ concluded that Plaintiff was capable of performing her past relevant work as a telephone solicitor, because this job did not require the performance of any work-related activities precluded by Plaintiff's RFC. (Tr. 95.) Based upon this conclusion, the ALJ determined that Plaintiff was not under a disability at any time between the alleged onset date through the last-insured date. (*Id.*)

**B. The Appeals Council's Decision**

In a decision dated August 18, 2015, the Appeals Council reviewed the ALJ's decision, upholding the ALJ's ultimate conclusion that Plaintiff was not disabled. (Tr. 4–7.) First, the Council noted that Plaintiff's last-insured date was June 30, 2012, rather than the date stated in the ALJ's decision. (Tr. 4) The Council agreed with the ALJ's findings under steps one, two, and three of the sequential evaluation process, concluding that Plaintiff had not engaged in substantial gainful activity since January 15, 2010 and that Plaintiff had severe impairments which did not meet or equal in severity an impairment in the Listings. (Tr. 5.) The Council disagreed, however, with the ALJ's determination, at step four, that Plaintiff could perform her past relevant work as a telephone solicitor. (*Id.*) When the VE stated that an individual with Plaintiff's limitations could perform this job, the ALJ had not included the limitation for occasional interaction with the public. (Tr. 5, 66–67.) When the ALJ added that limitation in a third hypothetical, the VE testified that an individual with this limitation could not do Plaintiff's past relevant work. (Tr. 5, 68.) For this reason, the Appeals Council concluded that the ALJ should not have denied Plaintiff's claim at step four. However, the Council noted that the VE had identified several jobs that could be performed consistently with the ALJ's RFC finding, such as addresser, bench hand, and surveillance system monitor. (Tr. 6.) For this reason, the Council affirmed the ALJ's ultimate conclusion that Plaintiff was not disabled at any time through June 30, 2012. (Tr. 7.)

## IV.    ANALYSIS

Plaintiff's primary argument on appeal is that the ALJ failed to give controlling weight to the opinion of Plaintiff's treating physician, and gave too much weight to the opinions of the consultative physicians who examined Plaintiff.  (Dkt. 16 ("Pl's Br.") at 14-5.)  Plaintiff also argues that the ALJ erred in finding that Plaintiff did not meet a listing (Pl's Br. At 12–14), in evaluating Plaintiff's credibility (Pl's Br. at 17), in finding that Plaintiff could perform sedentary work (Pl's Br. at 21), and in failing to consider the combination of Plaintiff's impairments (Pl's Br. at 23.)

Based on its assessment of the record, the Court concludes that the ALJ's decision suffers from a number of defects that justify a remand for further development of the record and for findings supported by substantial evidence.

### A.  The ALJ Failed to Comply with the Treating Physician Rule

The treating physician rule "generally requires deference to the medical opinion of a claimant's treating physician[.]" *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004) (per curiam); *see* 20 C.F.R. § 404.1527(c)(1)  ("Generally, [the Commissioner] give[s] more weight to the medical opinion of a source who has examined you than to the medical opinion of a source who has not examined you.").  According to SSA regulations, the Commissioner will give "controlling weight" to "a treating source's medical opinion on the issue(s) of the nature and severity of . . . impairment(s) [so long as the opinion] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2).  Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool." *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir.2003) (citation omitted).

The preference for a treating physician's opinion is generally justified because "[such] sources are likely to be [from] the medical professionals most able to provide a detailed, longitudinal picture of [Plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). By the same token, the opinion of a consultative physician, "who only examined a [p]laintiff once, should not be accorded the same weight as the opinion of [a] [p]laintiff's treating [physician]." *Anderson v. Astrue*, 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (citing *Spielberg v. Barnhart*, 367 F.Supp.2d 276, 282–83 (E.D.N.Y.2005)). This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Id.* (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir.1990)).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2), now codified at 20 C.F.R. § 404.1527(c)(2)). If the ALJ does not afford "controlling weight" to opinions from treating physicians, he needs to consider the following factors: (1) "the frequency of examination and the length, nature and extent of the treatment relationship;" (2) "the evidence in support of the opinion;" (3) "the opinion's consistency with the record as a whole;" and (4) "whether the opinion is from a specialist." *Clark*, 143 F.3d at 188; *accord Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir.2008). Although "[t]he ALJ is not required to explicitly discuss the factors," "it must be clear from the decision that the proper analysis was undertaken." *Elliott v. Colvin*, 13-CV-2673, 2014 WL 4793452, at *15 (E.D.N.Y. Sept. 24, 2014).

Furthermore, when a treating physician's opinions are repudiated, the ALJ must "comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33; *see Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999); *see also* 20 C.F.R. § 404.1527(d)(2) (stating that the Social Security agency "will always give good reasons in [its] notice of determination or decision for the weight [given to a] treating source's opinion" (emphasis added)). "The failure to provide 'good reasons' for not crediting a treating source's opinion is ground for remand." *See Burgin v. Astrue*, 348 F. App'x 646, 648 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33 (stating that the Second Circuit will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and . . . will continue remanding when [the Second Circuit] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." (changes in original omitted))).

Plaintiff argues that the ALJ erred in according "little" weight to Dr. Anthony's opinion regarding Plaintiff's RFC. Dr. Anthony's walking questionnaire found that Plaintiff could not use public transportation, could not walk for one block at a reasonable pace on rough or uneven surfaces, could not carry out routine ambulatory activities, and could not climb a few steps at a reasonable pace with the use of a handrail. (Tr. 532–33.) She also found that Plaintiff's knee injury could reasonably be expected to produce "severe" pain, and that Plaintiff's joint pain, swelling and tenderness of multiple joints resulted in significant restrictions. (Tr. 533.)

The Court agrees that the ALJ did not comply with the treating physician rule. The ALJ devoted a mere four sentences to the opinion of Dr. Anthony, Plaintiff's primary treating physician, and two of those sentences simply restated some of Dr. Anthony's medical findings. The ALJ then stated in completely conclusory fashion that "[a]fter reviewing the record, little weight is

accorded to the opinion of the claimant's treating physician" because "[t]he doctor's medical source statement is much more restrictive than what the radiological imaging shows, as well as how the claimant describes her own physical functioning." (Tr. 94.)

At most, this brief analysis mentions one of the required factors, "the opinion's consistency with the record as a whole," and, even then, it does so without any explanation or analysis. *Clark*, 143 F.3d at 188. The ALJ completely failed to address the other three factors, *i.e.*, "the frequency of examination and the length, nature and extent of the treatment relationship," "the evidence in support of the opinion,"[37] and "whether the opinion is from a specialist." *Id.* The ALJ certainly did not "comprehensively set forth [her] reasons for the weight assigned to [the] treating physician's opinion," *Halloran*, 362 F.3d at 33, nor did she "give good reasons" for her decision to give Dr. Anthony's assessment "little weight." *Burgin*, 348 F. App'x at 648.

Regarding the ALJ's reference to "what the radiological imaging shows," the ALJ was presumably adopting the testimony of the medical expert who testified at the ALJ Hearing, Dr. Galst, in finding that Plaintiff's imaging results did not support allegations of debilitating pain symptoms. However, the ALJ did not do so explicitly or explain her reasoning at all. Thus, this finding does not constitute a "comprehensively" explained reason for discounting Dr. Anthony's opinion.[38]

---

[37] The court construes this factor as referring to the evidence upon which the treating physician's opinion is based, as opposed to other evidence in "the record as a whole". *Clark*, 143 F.3d at 188 (identifying one of the other factors as "the opinion's consistency with the record as a whole").

[38] Indeed, contrary to the ALJ's decision, Plaintiff's radiological imaging records appear far more consistent with Dr. Anthony's opinion than Dr. Galst's. (*See*, *e.g.* (Tr. 391–96, 412-19 (MRIs and x-rays showing multiple disruptions, abnormalities, and irregularities in Plaintiff's leg, knee, ankle, and foot bones and joints).)

Furthermore, the ALJ does not explain the basis for her statement that Dr. Anthony's findings were "much more restrictive than . . . how [Plaintiff] describes her own physical functioning." (Tr. 94.) In fact, many of Plaintiff's statements regarding her physical ailments were completely consistent with Dr. Anthony's findings. For example, Plaintiff testified that she could not walk up or down stairs, could only stand for ten to fifteen minutes, could only sit comfortably for twenty to thirty minutes, and could only walk half a block before experiencing pain. Plaintiff also reported that she had "stabbing, throbbing," and "shooting" pain in her ankles, toes, knees, and wrists. She testified that she spent a quarter of the day sitting with her feet up, and a quarter of the day lying down. The ALJ did not discuss any of the portions of Plaintiff's testimony that were consistent with Dr. Anthony's findings.

Furthermore, even to the extent that any of Plaintiff's statements contradicted Dr. Anthony's findings, "Plaintiff's reports of her daily activities by themselves are not substantial evidence that she was not disabled and are insufficient to justify according [a treatment physician's] opinion limited weight" because "a claimant need not be an invalid to be found disabled." *Nusraty v. Colvin*, 15-CV-2018, 2016 WL 5477588, *12 (E.D.N.Y. Sept. 29, 2016). "[W]hen a disabled person gamely chooses to endure pain in order to pursue important goals . . . it would be a shame to hold this endurance against him." *Id.* (quoting *Balsamo v. Chater*, 142 F.3d 75, 81–82 (2d Cir. 1998)). "Indeed, it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Id.* (quoting *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 238 (E.D.N.Y. 2014)).

Furthermore, the ALJ also failed to acknowledge or consider the significant *consistency* between Dr. Anthony's findings and those of other treating sources. Dr. Tischler reported that

Plaintiff could walk approximately half a block and back, or two blocks with the assistance of a cane, and had "significant" difficulty negotiating stairs, with episodes of giving way. (Tr. 538.) After analyzing Plaintiff's MRI images, Dr. Tischler found a full-thickness chondral injury in Plaintiff's left knee, as well as several other abnormalities. (Tr. 542.) Dr. Jafari, Plaintiff's pain management doctor, similarly stated that Plaintiff presented with "multiple pain problems including axial back pain and bilateral knee pain," and confirmed the full-thickness chondral injury and other knee and leg injuries. (Tr. 256.) Even Dr. Galst testified that Plaintiff's full-thickness chondral injury could cause knee pain and limit Plaintiff's ability to walk, and that the bunions and calcaneal spurs in her feet and ankles could limit Plaintiff's ability to walk "somewhat." (Tr. 63–64.)

The Court has no way of knowing whether and to what extent the ALJ considered these statements from other sources. The ALJ only mentioned Dr. Tischler once, in the context of referring to his finding that Plaintiff could ambulate two blocks with a cane as contradictory to Plaintiff's testimony about having to use a cane—a finding that makes no sense. (Tr. 93.) The ALJ also mentioned Dr. Jafari only once, in a confusing passage that appeared to have the purpose of demonstrating that Plaintiff was not credible about experiencing pain, but that does not on its face demonstrate anything.[39]

In the absence of any explanation as to how the ALJ evaluated, if at all, the record evidence that was consistent with Plaintiff and Dr. Anthony's testimony, the Court can only assume that the

---

[39] "Also, though the claimant had injections administered by Dr. Jafari, a pain management doctor, the claimant testified that he had misdiagnosed the reasons for her pain and she stated that she had been told by that same doctor that they should not have given her the injections in the first place." (Tr. 93).

ALJ selectively considered only the records that were inconsistent with Dr. Anthony's findings, an approach that is prohibited. *See Nusraty*, 2016 WL 5477588, *11 (finding that "the ALJ's conclusion that [the treating physician's] opinion is inconsistent with his own notes and with the medical record is not supported by substantial evidence because the ALJ failed to consider the evidence in the record that is consistent with [the treating physician's opinion]"); *Poles v. Colvin*, 14-CV-6622, 2015 WL 6024400, at *4 (W.D.N.Y. Oct. 15, 2015) (finding that because the ALJ did not discuss records that undermined his conclusion, that conclusion was "improperly based on a selective citation to, and mischaracterization of, the record"); *Arias v. Astrue*, 11-CV-1614, 2012 WL 6705873, at *2 (S.D.N.Y. Dec. 21, 2012) ("The ALJ may not simply ignore contradictory evidence. When the record contains testimony tending to contradict the ALJ's conclusion, the ALJ must acknowledge the contradiction and explain why the conflicting testimony is being disregarded.")[40]

To the extent that the ALJ concluded that the record contradicted Dr. Anthony's findings, she had an "affirmative duty" to develop the record and "should have followed up with [the treating physician] to request supporting documentation or to obtain additional explanations for [her] findings." *Nusraty*, 2016 WL 5477588, at *13. *See also Ahisar v. Comm'r*, 14-CV-4134, 2015 WL 5719710, at *12 (E.D.N.Y. Sept. 29, 2015) ("[I]f a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." (quotations omitted)).

Completely disregarding the admonition that the opinion of a consultative physician who

---

[40] Because the ALJ did not discuss the undated, unsigned Vento form, the Court does not presume that it factored into the ALJ's decision to give little weight to Dr. Anthony's opinion.

only examined a plaintiff once should not be accorded the same weight as a treating physician, the ALJ discussed Dr. Kropsky's and Dr. Dubro's opinions in detail, and then concluded that "[g]reat weight is accorded to [their opinions] as their opinions were based on direct examinations of the claimant and consistent with laboratory and clinical findings." (Tr. 94–95.) These reasons for giving "great weight" to the consultative physicians are patently flimsy. The first reason—that their opinions were "based on direct examinations" would apply equally to Dr. Tischler, who examined Plaintiff once, and would apply to a much greater degree to Drs. Anthony and Jafari, who examined Plaintiff multiple times. Furthermore, the ALJ does not explain which laboratory and clinical findings Dr. Kropsky's and Dr. Dubro's opinions were consistent with, and why she was not crediting the clinical and laboratory findings that were inconsistent with their opinions.

Because the consultative sources on which the ALJ relied only evaluated Plaintiff on one occasion each, their evaluations "convey[] only a snapshot of Plaintiff's symptoms on the day of the examination or, at most, for a brief period close to that time," in contrast to the reports of Dr. Anthony, whose opinion reflects Plaintiff's condition over the course of six years. *Emsak v. Colvin*, 13-CV-3030, 2015 WL 4924904, *12 (E.D.N.Y. Aug. 18, 2015). The ALJ was thus required to give a much more detailed explanation of why she credited the opinions of Drs. Kropsky and Dubro over those of Plaintiff's long-time treating physician, Dr. Anthony.

Finally, without any explanation *at all*, the ALJ states that "some weight is . . . given to . . . [State agency psychiatric consultant] Dr. W. Skranovski, who opined that the claimant had no psychological limitations." (Tr. 95.) Dr. Skranovski did not even evaluate Plaintiff in person, but merely reviewed the record. Thus, his opinion should be given even less weight than that of Drs. Kropsky or Dubro.

Thus, the ALJ's unsupported and conclusory explanation for her reliance on the opinions

of the consultative physicians, as well as her rejection of the treating physicians' opinions, "cannot withstand judicial scrutiny." *Bracco v. Comm'r*, 13-CV- 2637, 2015 WL 1475862, at *17 (E.D.N.Y. March 31, 2015).

### B. The ALJ Erred in her Step Three Analysis

Plaintiff argues that the ALJ erred in finding that Plaintiff did not meet listing 1.02 (major dysfunction of a joint) or Section 100 (listing effects of obesity). The Court agrees that the ALJ erred in her step three analysis.

"It is particularly important for an ALJ to specifically address conflicting probative evidence with respect to the step three analysis, because a claimant whose condition meets or equals that of a Listing is deemed disabled *per se* and eligible to receive benefits." *Peach v. Colvin*, 15-CV-104S, 2016 WL 2956230, at *3 (W.D.N.Y. May 23, 2016) (citing 20 C.F.R. §§ 401.1520(d), 404.1525, 404.1526). When a claimant's symptoms "appear to match those described in a listing, the ALJ must explain a finding of ineligibility based on the Listings." *Id.* at *4 (internal quotation omitted). *See also Proper v. Comm'r*, 12-CV-98, 2014 WL 7271650, at *11 (W.D.N.Y. Dec. 18, 2014) (finding that "the ALJ's step three analysis [was] legally erroneous inasmuch as it provide[d] no record support or rationale for how he reached his findings as to listing equivalency"); *Hamedallah ex rel. E.B. v. Astrue*, 876 F. Supp. 2d 133, 144 (N.D.N.Y. 2012) (explaining that the ALJ's "one-sentence, conclusory analysis [of the step-three analysis] without any recitation of the facts or medical evidence . . . [was] plain error" warranting remand).

Regarding Section 1.02 of the Listings, governing injury to a weight-bearing joint, the ALJ merely stated that "the record does not document the required symptoms necessary to meet the requirements." (Tr. 91.) Regarding the obesity-related Section 100 listing, the ALJ merely stated that she had "considered the claimant's obesity" and "note[d] that the claimant's activities of daily

living and general functioning and inconsistent testimony [did] not fully support the claimant's level of complaints." (*Id.*)

The Court, therefore, agrees with Plaintiff that the ALJ's step three analysis is legally deficient. The ALJ has provided "no record support or rationale" for how she reached her findings. Although "the absence of an express rationale for an ALJ's conclusions does not prevent [the Court] from upholding them so long as [it is] able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence," *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010), here the other errors in the ALJ's decision, including her misapplication of the treating physician rule and failure to properly evaluate Plaintiff's credibility, prevent the Court from finding that the ALJ's step three analysis was supported by substantial evidence.

Listing 1.02, major dysfunction of a joint, is characterized by "gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, and instability) and chronic joint pain and stiffness with signs of limitation of motion" of the affected joints, with "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively." 20 CFR Part 404, Subpart P, App'x 1, Listing 1.02. As Plaintiff notes, her March 2, 2013 MRI of her knee showed a full-thickness chondral injury, a bony infarct within the medial femoral condyle and a Baker's cyst, and other MRIs of her ankles and feet showed other irregularities. Dr. Anthony found that Plaintiff could not walk one block at a reasonable pace on uneven surfaces, and could not use standard public transportation. Plaintiff stated that she used a cane, could not walk up or down stairs, had stabbing, throbbing, and shooting pain in her ankles, toes, and knees, and could not walk for more than half a block before experiencing pain. In light of the record evidence supporting a finding that Plaintiff met the requirements of Listing 1.02, the

ALJ was required to provide record support and rationale for her decision. [41]

## C. The ALJ Erred in Assessing Plaintiff's Credibility

In assessing whether a claimant is disabled, the ALJ may consider the claimant's allegations of pain and functional limitations; however, the ALJ retains the discretion to assess the claimant's credibility. *See Fernandez v. Astrue*, 11 CV 3896, 2013 WL 1291284, at *18 (E.D.N.Y. Mar.13, 2013) (citing *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir.2010) and *Correale–Englehart v. Astrue*, 687 F.Supp.2d 396, 434 (S.D.N.Y.2010)). The SSA regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must decide whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. 20 C.F.R. § 404.1529(b). Second, where the record shows that the claimant has such a medically determinable impairment, the ALJ evaluates "the intensity and persistence of [the claimant's] symptoms" to determine the extent to which they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c); *see also Fernandez*, 2013 WL 1291284, at *18. Where the ALJ finds that the claimant's testimony is inconsistent with the objective medical evidence in the record, the ALJ must evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to

---

[41] The ALJ can provide the necessary explanation either by comparing the symptoms and findings from the record with the corresponding criteria, or by "expressly adopt[ing] a medical source statement that discusses the medical evidence and arrives at express conclusions concerning the Listings." *Peach,* 2016 WL 2956230, at *3.

relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3) (i)-(vii).

At the first step of her credibility determination, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 94.) However, at the second step, she found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (*Id.*)

As a preliminary matter, the ALJ did not explicitly state which factors listed in 20 C.F.R. § 404.1529(c)(3) she considered in making her credibility determination. *Emsak*, 2015 WL 4924904, at *16. She clearly addressed factor (i) in discussing Plaintiff's reported social interactions, lack of the use of a cane, and daily household activities. The ALJ may have addressed factor (v) in stating that "[t]hough the claimant was diagnosed with anxiety, she does not see a psychiatrist," although the ALJ acknowledged that Plaintiff's primary care physician prescribed her Xanax, which she took daily to treat her symptoms. (Tr. 92.) The ALJ also noted without elaboration that Plaintiff had cancelled a lap band procedure, (Tr. 93), perhaps implying that this undermined Plaintiff's testimony about the effects of her obesity. This could also be considered a reference to factor (v). In any event, what is clear is that the ALJ failed to conduct a thorough analysis of the required seven factors in reaching the conclusion that Plaintiff was not entirely credible.

Many of the ALJ's reasons for her credibility determination are extremely weak. For example, the ALJ found that Plaintiff's statement that medications made her nauseous, dizzy, and tired was "inconsistent" with her prior testimony that Percoset had made her nauseous and dizzy, but Vicodin was better. The ALJ does not explain why Plaintiff could not have been referring to the many other medications she took and not simply Vicodin, when she testified that her

medications made her nauseous.  Furthermore, Plaintiff's statement that Vicodin was "a little better," (Tr. 38,) did not necessarily mean that it had no side effects.

The ALJ also relied on Dr. Tischler's statement about Plaintiff being able to walk two blocks with a cane to cast doubt on Plaintiff's testimony that she needed a cane, but the effect of the doctor's statement neither contradicts nor calls into question Plaintiff's claim.   Indeed, Plaintiff's MRIs and x-rays show osteoarthritis and other impairments with both of Plaintiff's knees, and even Dr. Galst found that abnormalities in Plaintiff's ankles suggested arthritis.  Relatedly, the ALJ discredited Plaintiff's explanation that she did not always use a cane because it hurt her wrist to do so.  Yet, despite Plaintiff's consistent reports of wrist pain, the ALJ dismissed these complaints as "inexplicabl[e]" because "[t]he medical evidence . . .  contains absolutely no mention of any issues dealing with the claimant's wrist."  (Tr. 93–94).   The ALJ similarly concluded that Plaintiff's ability to fold laundry, read, and do dishes contradicted her testimony about not being able to carry a gallon of milk because of wrist pain.   On its face, this conclusion makes little sense; the first set of activities do not inherently involve lifting or carrying heavy objects, such that a person could perform those activities (perhaps with some pain), but still be unable to pick up a heavy item, such as a gallon of milk, because it is too painful.

Thus, the Court finds that the ALJ did not conduct a proper analysis of Plaintiff's credibility and that her credibility determination with regard to Plaintiff is not supported by substantial evidence.  On remand, the ALJ should reassess Plaintiff's credibility with reference to the factors listed in § 404.1529(c)(3).  To the extent the ALJ discredited Plaintiff's statements concerning her pain or the intensity, persistence, and limiting effects of her impairments, the ALJ should indicate how she assessed and balanced the various factors in § 404.1529(c)(3).

On remand, the ALJ should also consider Plaintiff's work history when making her

credibility assessment. Plaintiff testified that she had worked steadily until 2006 as a sales manager at a telemarketing firm, monitoring 30 employees. "A plaintiff with a good work history is entitled to substantial credibility when claiming inability to work." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir.1983); *see also Fernandez*, 2013 WL 1291284 at *20 (finding the plaintiff was entitled to substantial credibility based on a 25–year work history).

### D. Plaintiff's Other Arguments

Plaintiff also argues that the ALJ, and presumably the Appeals Council as well, erred in finding that Plaintiff had the RFC to perform sedentary work with a sit/stand option. Plaintiff argues that this finding was contradicted by Dr. Anthony's assessment that Plaintiff could only sit for a maximum of two hours and could not stand or walk for any significant length of time, and by Plaintiff's testimony that she could sit for a maximum of 20 to 30 minutes and usually sat with her feet elevated. (P. Mot. at 21–22.) The ALJ's previously discussed errors impact the Court's ability to properly evaluate the RFC analysis. On remand, the ALJ should reevaluate Plaintiff's RFC after proper analysis of Dr. Anthony's testimony, Plaintiff's credibility, and whether Plaintiff meets a listed impairment.

Finally, Plaintiff argues that the ALJ failed to properly consider the combination of Plaintiff's impairments. Although the ALJ may have considered Plaintiff's impairments in combination, as suggested in her reference to the "combination of impairments" (Tr. 90), on remand, the ALJ should conduct a new analysis of the combined effects of all of Plaintiff's impairments in light of any revised findings.

### CONCLUSION

For the reasons set forth above, the Court DENIES the Commissioner's motion for judgment on the pleadings and GRANTS Plaintiff's cross-motion. The Commissioner's decision

is remanded for further consideration and new findings consistent with this Memorandum & Order.

The Clerk of Court is respectfully requested to close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: Brooklyn, New York
     April 3, 2017